**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARIEL DAVIS, LACIE DAVIS, and TAYLOR DAVIS, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:22-cv-05069 |
| | ) | |
| v. | ) | Hon. Martha M. Pacold |
| | ) | |
| e.l.f. COSMETICS, INC., | ) | Magistrate Sheila M. Finnegan |
| | ) | |
| Defendant. | | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**
**PLAINTIFFS' COMPLAINT IN FAVOR OF ARBITRATION,**
**OR IN THE ALTERNATIVE, FOR FAILURE TO STATE A CLAIM**

Matthew C. Wolfe
Erin Bolan Hines
Yara K. Rashad
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7700
mwolfe@shb.com
ehines@shb.com
yrashad@shb.com

*Attorneys for Defendant*
*e.l.f. Cosmetics, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

ARGUMENT ......................................................................................................................2

    I.    Plaintiffs' claims should be dismissed in favor of arbitration. ...............................2

        A.    Plaintiffs had constructive knowledge of the January 2022 Terms
              of Use. ................................................................................................2

        B.    This litigation is subject to the arbitration provision. ..................................6

    II.    Plaintiffs do not plausibly plead that a "scan of face geometry" was
        collected or possessed by e.l.f., or that such a scan could have been used to
        identify them. ..........................................................................................7

        A.    Plaintiffs' admission that they do not allege e.l.f. could identify
              them should end this case. ......................................................................7

              1.    BIPA applies only to *biometric* identifiers and information,
                    which necessarily must be capable of identifying an
                    individual. .............................................................................7

              2.    A "biometric identifier" must be associated with a person's
                    identity. ..............................................................................8

               3.    Plaintiffs do not plead that e.l.f. could identify them.....................11

        B.    Plaintiffs do not plausibly plead that a "scan of face geometry" was
               collected or possessed by e.l.f. ................................................................13

        C.    Dismissal under Rule 12(b)(6) should be with prejudice. .........................14

    III.    Plaintiffs do not meet the pleading requirements for heightened damages. ..........15

CONCLUSION ....................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acaley v. Vimeo*,
464 F. Supp. 3d (N.D. Ill. 2020) ........................................................................3, 5

*Barnett v. Apple Inc.*,
No. 1-22-0187, 2022 WL 17881712 (Ill. App. Ct. Dec. 23, 2022) ........................13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................11, 12, 14

*Carpenter v. McDonald's Corp.*,
580 F. Supp. 3d 512 (N.D. Ill. 2022) ........................................................................8

*Daichendt v. CVS Pharmacy, Inc.*,
No. 22 CV 3318, 2022 WL 17404488 (N.D. Ill. Dec. 2, 2022) ........................8, 11

*Evans v. Cook Cty. State's Atty.*,
183 N.E.3d 810 (Ill. 2021) ........................................................................10

*Gamboa v. Proctor & Gamble Co.*,
No. 21 C 6515, 2022 WL 1639559 (N.D. Ill. May 24, 2022) ........................2, 3

*Gore v. Alltel Commc'ns, LLC*,
666 F.3d 1027 (7th Cir. 2012) ........................................................................6

*Haywood v. Massage Envy Franchising, LLC*,
887 F.3d 329 (7th Cir. 2018) ........................................................................14

*Hubbert v. Dell Corp.*,
835 N.E.2d 113 (Ill. App. Ct. 2005) ........................................................................4

*In re Marriage of Goesel*,
102 N.E.3d 230 (Ill. 2017)........................................................................10

*James Cape & Sons Co. v. PCC Const. Co.*,
453 F.3d 396 (7th Cir. 2006) ........................................................................14

*Kukovec v. Estee Lauder Companies, Inc.*,
No. 22 CV 1988, 2022 WL 16744196 (N.D. Ill. Nov. 7, 2022)........................5, 15

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)........................................................................5

*Namuwonge v. Kronos, Inc.*,
2019 WL 6253807 (N.D. Ill. Nov. 22, 2019) ........................................................................15

*Nationstar Mortgage LLC v. Benavides*,
  171 N.E.3d 514 (Ill. App. Ct. 2020) ...................................................................9

*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016).................................................................................5

*Novitsky v. Am. Consulting Eng'rs, L.L.C.*,
  196 F.3d 699 (7th Cir. 1999) ...............................................................................3

*PDC Labs., Inc. v. Hach Co.*,
  No. 0901110, 2009 WL 2605270 (C.D. Ill. Aug. 25, 2009)...................................3

*Plazza v. Airbnb, Inc.*,
  289 F. Supp. 3d 537 (S.D.N.Y. 2018)...................................................................5

*Rivera v. Google*,
  238 F. Supp. 3d 1088 (N.D. Ill. 2017) ................................................................12

*Rosenbach v. Six Flags Entm't Corp.*,
  129 N.E.3d 1197 (Ill. 2019) ..............................................................................7, 8

*Specht v. Netscape Commc'ns Corp.*,
  306 F.3d 17 (2d Cir. 2002)....................................................................................4

*Trio v. Turing Video, Inc.*,
  No. 1:21-CV-04409, 2022 WL 4466050 (N.D. Ill. Sept. 26, 2022)......................12

*West Bend Mut. Ins. Co. v. Krishna Schaumburg Tan, Inc.*,
  183 N.E.3d 47 (Ill. 2021)......................................................................................8

*Wilson v. Redbox Automated Retail, LLC*,
  448 F. Supp. 3d 873 (N.D. Ill. 2020) ...................................................................3

**REGULATIONS**

State of Illinois, Office of the Attorney General, Public Access Op. No. 17-011,
  2017 WL 10084298 (Ill. A.G. Aug. 14, 2017) .......................................................8

**STATUTES**

740 ILCS 14/5.....................................................................................................8, 10

740 ILCS 14/10..................................................................................................7, 10

740 ILCS 14/15...............................................................................................7, 8, 10

34 Ill. Law and Prac. Statutes § 69 ..........................................................................9

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019)..........................................................................9

Merriam-Webster, https://www.merriam-webster.com..................................................9

Merriam-Webster, https://www.merriam-webster.com/dictionary/biometrics..............9

## **INTRODUCTION**

In their Response, Plaintiffs attempt to circumvent e.l.f.'s arbitration agreement and class action waiver by arguing that another version of the Terms of Use, different from the May 2022 Terms of Use repeatedly referenced in their Complaint, was in effect at the time they used the Virtual Try-On tool. Plaintiffs' changing story does not save their claims from dismissal. No matter which version of the Terms of Use applies, a binding arbitration agreement, conspicuously linked on every page of e.l.f.'s website, provided Plaintiffs with constructive knowledge of the terms of the agreement, including the express requirement to resolve all of the claims in this litigation through arbitration. Plaintiffs' continuous visits to e.l.f.'s website, which placed its Terms of Use in the exact location used by the vast majority of websites, and repeated use of the Virtual Try-On tool, manifested their assent to these binding terms.

If Plaintiffs' claims are not dismissed in favor of arbitration, they must be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs do not plausibly state a claim under BIPA because nowhere in their Complaint do they describe how the Virtual Try-On tool works, allege that the Virtual Try-On tool collects information that can be used to identify an individual, or explain how e.l.f. could ever gain access to such information (if it were collected). And, rather than address these deficiencies, Plaintiffs double down, contending that they can allege e.l.f. violated the *Biometric* Information Privacy Act without even pleading that e.l.f. could actually identify them through the Virtual Try-On tool.

At bottom, Plaintiffs' position is that they don't know how the Virtual Try-On tool works and don't contend it can identify them, but nonetheless try to persuade the Court that because it involves a photo and technology, it must do *something* that implicates BIPA. Their position is inconsistent with fundamental rules of pleading, the plain meaning of the word "biometric," and

common sense. It would stretch BIPA beyond any reasonable interpretation. Accordingly, for either of those two reasons, the case should be dismissed.

<u>**ARGUMENT**</u>

**I.      Plaintiffs' claims should be dismissed in favor of arbitration.**

Plaintiffs' Complaint refers almost exclusively to the substantive aspects of the most up-to-date version of the Terms of Use found on e.l.f.'s website (the "May 2022 Terms of Use"). Compl. ¶¶ 61, 63, 65, 66, 73. Changing their argument, Plaintiffs now focus on a previous version of the Terms of Use (the "January 2022 Terms of Use") that was in effect when they purportedly last visited e.l.f.'s website. Opp. at 2. In all events, both the January 2022 Terms of Use and the May 2022 Terms of Use contain materially identical arbitration provisions and class action waivers. *See* e.l.f.'s Motion to Dismiss at 9 (Dkt. 24); Decl. of Shana Rungsarangnont at ¶¶ 12-17 (Dkt. 24-1). As discussed next, Plaintiffs had constructive knowledge of the Terms of Use (whether the January 2022 Terms of Use or the May 2022 Terms of Use) and as such, this case should be dismissed in favor of arbitration.

**A.      Plaintiffs had constructive knowledge of the January 2022 Terms of Use.**

Plaintiffs do not dispute that the January 2022 Terms of Use contain the arbitration provision, nor do they disagree that this provision was, at all times, available on e.l.f.'s website. Plaintiffs' only quibble with the January 2022 Terms of Use is the lack of a pop-up notice requiring users to agree to e.l.f.'s Terms of Use by clicking "Proceed" before they can access the Virtual Try-On tool. Opp. at 2. A pop-up notice, however, is not required for a user to manifest assent to an arbitration agreement.

Online contracts that are binding and enforceable without any active manifestation of assent are known as browsewrap agreements. *Gamboa v. Proctor & Gamble Co*., No. 21 C 6515, 2022 WL 1639559, at *2 (N.D. Ill. May 24, 2022). To be bound by the terms of a browsewrap

agreement, a user must have either actual or constructive knowledge of the terms of the agreement. *Id*. A party is deemed to have constructive knowledge of an agreement's terms and conditions when she is provided with clear and conspicuous notice of them, such as access to a hyperlink containing those terms and conditions. *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 882 (N.D. Ill. 2020). A user is not required to review or read the terms and conditions in order to be bound by them. *See Novitsky v. Am. Consulting Eng'rs, L.L.C.,* 196 F.3d 699, 702 (7th Cir. 1999) (similar to the pre-digital world, internet users "are free to sign legal documents without reading them, but the documents are binding whether read or not.").

In their Response, Plaintiffs dismiss browsewrap agreements entirely, mischaracterizing the cases cited in e.l.f.'s Motion to Dismiss as clickwrap agreement situations requiring an active manifestation of assent. *See* Opp. at n. 4. The cases cited in e.l.f.'s Motion to Dismiss, when read accurately, support the enforceability of browsewrap agreements that do not require any active manifestation of assent. For example, in *Acaley v. Vimeo*, the court found it was not dispositive whether an arbitration agreement was characterized as "clickwrap" or "browsewrap" so long as the users received reasonable notice that their use of a web application constituted assent to the terms of service, which contained an arbitration clause. 464 F. Supp. 3d 959, 968 (N.D. Ill. 2020). Accordingly, the court rejected various arguments by the plaintiff that the links at issue were "hidden," and held that the contract was enforceable. *Id*. at 967-68. In *PDC Labs., Inc. v. Hach Co.*, the court enforced a limitation of damages clause contained within the terms and conditions of an online order form because a hyperlink to the terms and conditions was included on multiple pages of the website in underlined, contrasting text. No. 09–1110, 2009 WL 2605270, at *3 (C.D. Ill. Aug. 25, 2009).

Perhaps most importantly, in *Hubbert v. Dell Corp.*, the Illinois Appellate Court enforced an arbitration clause under circumstances similar to those here. In *Hubbert*, an online purchaser of a computer argued that he did not agree to the seller's terms of service, which appeared on all five pages required to complete the transaction through contrasting hyperlinks. 835 N.E.2d 113, 121 (Ill. App. Ct. 2005). The Appellate Court rejected the plaintiff's argument that because the terms and conditions *themselves* were not displayed without clicking on the hyperlink, the terms and conditions did not apply to their dispute. *Id.* (the "hyperlink simply takes a person to another page of the contract, similar to turning the page of a written paper contract. . . . A person using a computer quickly learns that more information is available by clicking on a . . . hyperlink")

Against the Illinois law established by *Hubbert*, Plaintiffs rely on non-binding cases, most of which were not decided under Illinois law, to argue that the hyperlink to the January 2022 Terms of Use was not reasonably conspicuous on e.l.f.'s website. Opp. at 6-7. Plaintiffs' reliance on these cases is misguided for two reasons. First, under Illinois law, there is no conspicuousness requirement. *Hubbert*, 835 N.E.2d at 121 ("[T]here is no conspicuousness requirement."). Second, even if there were a conspicuousness requirement, none of the circumstances supporting a finding of non-conspicuousness in Plaintiffs' largely outdated cases are present here. Indeed, the *Netscape* case relied upon by Plaintiffs dates from 2002 and involves very early instances of consumer downloads of desktop web browsers. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32 (2d Cir. 2002) (California law) (finding no constructive notice because the webpage screen containing a hyperlink to the website's rules and regulations was "printed in such a manner that it tended to conceal the fact that it was an express acceptance of [Netscape's] rules and regulations.").

Today, hyperlinked terms of use are on every website, most often appearing in the footer at the bottom of webpages. *See*, *e.g.*, TERMS OF USE, https://www.apple.com/ (last visited Feb. 8,

2023); TERMS, https://www.target.com/ (last visited Feb. 8, 2023). A reasonable consumer knows from experience that using a website service is conditioned on the acceptance of specific terms of use, often accessible via hyperlinks at the bottom of the website.[1] And in the context of online contract formation, a reasonably prudent internet user is presumed to have familiarity with internet contracts governed by hyperlinked terms and conditions. *See*, *e.g.*, *Acaley,* 464 F. Supp. 3d at 967 ("A reasonable person would have understood that the 'More options' hyperlink provided more options for continuing to use the app and that continued use of any sort amounted to assent to the terms of service."); *Plazza v. Airbnb, Inc.,* 289 F. Supp. 3d 537, 548 (S.D.N.Y. 2018) (explaining that browsewrap agreements are usually found "where a website's terms and conditions are . . . posted on the website via a hyperlink at the bottom of the screen" and a user's assent is given merely by his or her use of the website and nothing more); *Meyer v. Uber Techs., Inc.,* 868 F.3d 66, 77–78 (2d Cir. 2017) ("When considering the perspective of a reasonable smartphone user, we need not presume that the user has never before encountered an app or entered into a contract using a smartphone.").

e.l.f.'s presentation of its Terms of Use is common, aligns with industry standards, and places a reasonable user on notice. The cases cited by Plaintiffs do not change that analysis. *E.g.*, *Kukovec v. Estee Lauder Companies, Inc*., No. 22 CV 1988, 2022 WL 16744196, at *6 (N.D. Ill. Nov. 7, 2022) (no constructive notice where hyperlink to website's terms of use was placed in the middle of 15 links to other pages and in the middle of 6 links to other social media websites); *Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 237 (2d Cir. 2016) (Washington law) (finding no constructive notice because website's order page where hyperlink to conditions of use was located

---

[1] Indeed, Plaintiffs' counsel's own website contains a hyperlink to the website's terms of use in a footer at the bottom pages of the website. *See* DISCLAIMER & TERMS OF USE, https://www.hausfeld.com/ (last visited Feb. 8, 2023).

contained 15 to 25 additional links, various text displayed in at least four different font sizes and colors, multiple buttons and promotional advertisements, and included the customer's personal address, credit card information, shipping options, and purchase summary).

A hyperlink to the website's Terms of Use has always appeared on every page of e.l.f.'s website. Rungsarangnont Decl. at ¶ 11. This hyperlink has never been hidden or buried. It appears in contrasting white text (on a black background) and is the first link on a static footer that appears on every page of e.l.f.'s website, including e.l.f.'s home page and checkout page. *Id.* at ¶¶ 10-11. Given the ubiquitous placement of hyperlinks to terms of use in the footers of a multitude of websites across the internet, a reasonable user would have known where to find a hyperlink to e.l.f.'s Terms of Use, and would have been on notice that by using e.l.f.'s website, and anything featured on the website, the Terms of Use would apply. Further, like in *Hubbert*, once a user clicked on the hyperlink to the January 2022 Terms of Use, she would have been presented with the following notice at the top of the agreement in all capital letters: BINDING ARBITRATION AGREEMENT; CLASS ACTION WAIVER. Rungsarangnont Decl. at Ex. 1. Because Plaintiffs had, at the very least, constructive notice of the January 2022 Terms of Use, their claims must be dismissed in favor of arbitration.

**B.      This litigation is subject to the arbitration provision.**

Once it is clear "that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012). The Terms of Use that Plaintiffs claim were in effect at the time they accessed the Virtual Try-On tool contained a binding, valid, and mandatory arbitration provision. *See* Rungsarangnont Decl. at Ex. 1. It is undisputed that the arbitration provision applies to all of the

claims in this litigation. Therefore, even under the January 2022 Terms of Use, Plaintiffs' notice of the arbitration provision requires dismissal of their claims.

**II.      Plaintiffs do not plausibly plead that a "scan of face geometry" was collected or possessed by e.l.f., or that such a scan could have been used to identify them.**

In the event that the Court does not dismiss the Complaint in favor of arbitration, it should dismiss the case on its merits pursuant to Rule 12(b)(6).

**A.      Plaintiffs' admission that they do not allege e.l.f. could identify them should end this case.**

**1.      BIPA applies only to *biometric* identifiers and information, which necessarily must be capable of identifying an individual.**

The purpose of BIPA is stated in the statute: Because biometrics are "biologically unique to the individual" and present "heightened risk for identity theft," the "public welfare, security, and safety will be served by regulating . . . biometric identifiers and information." 740 ILCS 14/15. In turn, "biometric identifier" and "biometric information" are defined in the statute. 740 ILCS 14/10. For BIPA to apply at all, a "private entity" must collect or possess either a "biometric identifier" or "biometric information." 740 ILCS 14/15.

As the Illinois Supreme Court has explained, BIPA "codified that individuals possess a right to privacy in and control over their biometric identifiers and biometric information." *Rosenbach v. Six Flags Entm't Corp.*, 129 N.E.3d 1197, 1206 (Ill. 2019). "[W]hen a private entity fails to comply with [BIPA], that violation constitutes an invasion, impairment, or denial of the statutory rights of any person whose biometric identifier or biometric information is subject to the breach;" such a person is "aggrieved" within the meaning of section 20 of the Act and may sue. *Id*. Importantly, in *Rosenbach* and other cases, the Illinois Supreme Court held that violations of BIPA are not merely technical, but rather present an injury that is "real and significant." *Id*. The Illinois Supreme Court has explained that the injury is "real and significant" because BIPA protects

a "secrecy interest" in biometric data, providing individuals with "the power to say no" to the collection and disclosure of biometrics. *Id.*; *see also West Bend Mut. Ins. Co. v. Krishna Schaumburg Tan, Inc.*, 183 N.E.3d 47, 58 (Ill. 2021) (BIPA "protects a secrecy interest—here, the right of an individual to keep his or her personal identifying information like fingerprints secret.").

Accordingly, the protections provided by BIPA are "crucial *precisely because* they protect information that is "biologically unique to the individual." *Rosenbach*, 129 N.E.3d at 1206 (quoting 740 ILCS 14/5(c)) (emphasis added).

### 2. A "biometric identifier" must be associated with a person's identity.

Plaintiffs do not dispute that for BIPA to apply at all, e.l.f. must have collected or possessed their biometric identifiers. Opp. at 8-11; *see also* 740 ILCS 14/15(a)-(b). The plain language of the statute and the decisions interpreting it demonstrate that the injury against which BIPA is designed to protect is an individual's right to control the use of her own biometric identifiers—that is, identifiers used to identify her. Indeed, as Judge Gettleman put it in *Daichendt v. CVS Pharmacy, Inc.,* to state a claim, "plaintiffs must allege that defendant's collection of their biometric data made defendant capable of determining their identities. . . the most foundational aspect of a BIPA claim." No. 22 CV 3318, 2022 WL 17404488, at *5 (N.D. Ill. Dec. 2, 2022) (internal citations omitted).

In other words, if the data is not associated with an individual's identity, it is not a biometric identifier at all. *See Rosenbach*, 129 N.E. 3d at 1206 (BIPA protects a "secrecy interest" that is personal and unique to the individual whose biometrics are collected.); *West Bend*, 183 N.E.3d at 58 (BIPA protects "the right of the individual to keep his or her personal identifying information like fingerprints secret"); *Carpenter v. McDonald's Corp.*, 580 F. Supp. 3d 512, 515 (N.D. Ill. 2022) ("A biometric identifier is a unique personal feature that can be used to identify a person."); State of Illinois, Office of the Attorney General, Public Access Op. No. 17-011, 2017 WL

10084298, at *3 (Ill. A.G. Aug. 14, 2017) ("biometric identifier" encompasses only information "that identifies a person").

In addition to the case law, the plain meaning of "biometric identifier" supports this reading. "Biometrics" are "the measurement and analysis of unique physical or behavior characteristics (such as fingerprint or voice patterns) especially as a means of verifying personal identity." Merriam-Webster, https://www.merriam-webster.com/dictionary/biometrics (emphasis added). "'[I]dentify' means to establish the identity of." *Nationstar Mortgage LLC v. Benavides*, 171 N.E.3d 514, 520 (Ill. App. Ct. 2020); *see also* Black's Law Dictionary (11th ed. 2019) (defining "identify" as "to prove the identity of a person or thing"); Merriam-Webster, https://www.merriam-webster.com (defining "identifier" as "one that identifies," and "identify" as meaning to "perceive or state the identity of" or to "ascertain the identity of"). Putting the plain meaning of "biometric" and "identifier" together, "biometric identifier" necessarily includes identification of an individual.

Against this, Plaintiffs posit that a "scan of face geometry" can be a "biometric identifier" even if it can't be used to identify an individual. Opp. at 12. But a plain reading of the actual language of the statute contradicts Plaintiffs and supports e.l.f. "Biometric identifier" does not need to contain the words "used to identify an individual" because, as discussed above, identification of an individual is inherent in the terms "biometric" and "identifier"—especially when they are read together, as they must be here. *See, e.g.*, 34 Ill. Law and Prac. Statutes § 69 (discussing doctrine of in pari materia, which requires "all the parts, provisions, or sections of a statute [] be read, considered, or construed together, in the light of the general purpose and object of the statute" (footnote and citations omitted)). The concept of identification unifies the specific types of identifiers enumerated in the definition.

Principles of statutory construction also support e.l.f.'s reading. First, in construing the statute, the Court must view it "as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation." *Evans v. Cook Cty. State's Atty.*, 183 N.E.3d 810, 818 (Ill. 2021). Thus, it is appropriate to look to other parts of the statute to help interpret the term "biometric identifier." *Id*. Here, the extensive legislative findings demonstrate the legislature was concerned about protecting biometrics because they "are biologically unique to the individual" and, "unlike other unique identifiers," could not be changed thereby giving rise to a "heightened risk for identity theft." 740 ILCS 14/5(c). Accordingly, the legislature regulated biometric identifiers—which must be used to identify an individual—and biometric information. The legislature then added "used to identify an individual" within the definition of "biometric information" to emphasize that the legislature intended to regulate data used for identification, not simply collection of data. *See* 740 ILCS 14/10. Further demonstrating the above, "confidential and sensitive information," which includes non-biometric "personal information that can be used to uniquely identify an individual or an individual's account or property," is not regulated by BIPA. 740 ILCS 14/10 & 15. Each of these provisions emphasizes that BIPA is focused on data that a private entity actually gains control over in order to identify an individual.

Finally, interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available. *In re Marriage of Goesel*, 102 N.E.3d 230, 235 (Ill. 2017). Plaintiffs' Complaint tries to allege that any "scan of face geometry," regardless of whether it can identify an individual, is enough to trigger the statute. This theory leads to absurd results, as it would mean that even, for example, an anonymous fingerprint smudge would be subject to the statute. To implicate the statute, the biometric identifier must actually be matched to a person. "Collection" of an anonymous fingerprint or scan of face

geometry does not fall within the statute, because an anonymous "identifier" is neither biometric nor an identifier—it's anonymous.

### 3. Plaintiffs do not plead that e.l.f. could identify them.

Plaintiffs concede they have not pled that any "scan of face geometry" was used, or even could be used, to identify them. Rather, Plaintiffs argue that they do not need to plead that e.l.f. could actually identify an individual. Opp. at 13. As discussed above, Plaintiffs' argument is foreclosed by the case law, the statutory text, canons of construction, and common sense. In reality, it is a concession that Plaintiffs have not met their burden to plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Instead of pointing to a single allegation that e.l.f. actually could identify them (e.l.f. can't), Plaintiffs hypothesize, without any reference to the underlying technology, that e.l.f. "created a complete scan of Plaintiffs' facial geometry," which is, "by definition, capable of being used to identify an individual." All Plaintiffs are doing here is saying that e.l.f. provided a technology that allowed them to use their own phone to see how makeup looks on their face, so there must be a BIPA claim in there somewhere. That's not enough.

Rather, "plaintiffs must allege that defendant's collection of their biometric data made defendant capable of determining their identities." *Daichendt*, 2022 WL 17404488, at *5 (N.D. Ill. Dec. 2, 2022) (emphasis in original). Plaintiffs do not allege that e.l.f. used, or was capable of using, their biometric data to determine their identities. Nor do Plaintiffs allege that they provided e.l.f. with any information that could connect the voluntary scans of face geometry to their identities. Thus, here just as in *Daichendt*, "plaintiffs do not plead that defendant, in fact, 'used' their biometric data to determine their identities. They also do not plead that defendant could do so. Plaintiffs do not allege that they provided defendant with any information . . . that could connect

the voluntary scans of face geometry with their identities. Thus, plaintiffs have failed to plead the most foundational aspect of a BIPA claim." *Id*. That should end this matter.

The rest of the case law cited by Plaintiffs doesn't support their position either. Plaintiffs admit that *Rivera v. Google*, like *Daichendt*, established that "biometric identifier" means "a biology-based set of measurements that can be used to identify a person." Opp. at 13 (citing *Rivera*, 238 F. Supp. 3d 1088, 1094 (N.D. Ill. 2017). In cases like *Rivera* and *Trio v. Turing Video*, the plaintiffs actually alleged that the defendants were able to identify them. *See Rivera*, 238 F. Supp. 3d at 1091 (alleging Google created facial "templates" of plaintiffs that was then "used by Google to find and group together photos of them," and to "recognize their gender, age, race, and location"); *Trio v. Turing Video, Inc*., No. 1:21-CV-04409, 2022 WL 4466050, at *12 (N.D. Ill. Sept. 26, 2022) (discussing detailed allegations that defendant collected the user's facial geometry and analyzed the data collected through the use of an algorithm that "recognizes the user," then stored the data collected from the camera in its databases, which can identify up to 20 million faces and was "used to track and report individuals who may have been exposed to COVID-19"). In contrast, Plaintiffs here admit that their Complaint does not contain any allegation that e.l.f. used the biometrics at issue to identify them. Opp. at 13.

Taken to its logical conclusion, Plaintiffs' argument would allow, for example, an ATM owner to be subject to BIPA if an ATM user leaves his fingerprints on the screen, even if the owner has no idea who those fingerprints belong to. BIPA simply does not stretch that far. Plaintiffs' Complaint does not even try to allege that e.l.f. could have identified them with the data it allegedly possessed. Thus, it must be dismissed for failure to state a claim.

**B.     Plaintiffs do not plausibly plead that a "scan of face geometry" was collected or possessed by e.l.f.**

Plaintiffs' Complaint also fails for another reason: the Complaint does not allege that e.l.f. ever collected or possessed any relevant data, because Plaintiffs do not allege that any biometric identifiers ever leave the user's device. *See Barnett v. Apple Inc.*, No. 1-22-0187, 2022 WL 17881712, at *7 (Ill. App. Ct. Dec. 23, 2022) (affirming dismissal of claim where users did not lose control over biometric information stored on their own personal devices to Apple). Rather, it is apparent from Plaintiffs' Complaint that users employ their own personal devices to utilize the Virtual Try-On tool, Compl. ¶ 68 (explaining that the Virtual Try-On tool operates by using the camera on a user's computer or mobile device); that the biometric identifiers allegedly captured by the Virtual Try-On tool are stored only on the users' personal devices, Compl. ¶ 72 (alleging that e.l.f. collects biometric data "locally from the live feed or photo on the user's device."); and that e.l.f. does not store this information on its servers, *id.* (alleging that e.l.f. collects visitors' biometric data locally from the user's device without alleging that e.l.f. stores this information on its own servers or devices). Plaintiffs' allegations that e.l.f. "possessed" or "collected" their biometric identifiers through the Virtual Try-On tool have not been adequately pled and must be dismissed. *See Barnett*, No. 1-22-0187, at *7 (plaintiffs did not adequately plead "possession" because complaint alleged that users utilized their own personal devices to capture their fingerprints or facial images and did not allege that this information was stored on defendant's server); *Id.* at *8 (plaintiffs did not adequately plead "collection" because the biometric information at issue was stored exclusively on users' devices).

Instead of facts, Plaintiffs rely on inferential leaps from their Complaint that do not support that a "scan of face geometry" took place at all. According to Plaintiffs' Complaint, the Virtual Try-On tool operates by requesting access to users' personal device cameras. Compl. ¶ 69. Once

the user allows access to their camera, Plaintiffs, without any reasonable description of the underlying technology, theorize that the Virtual Try-on tool creates a "biometric facial scan" from the user's photo or live video. *Id*. ¶ 66. Then, as if by magic, e.l.f. is able to collect, obtain and possess this "biometric facial scan" from the user's personal device. *Id*. at ¶ 70. Nowhere in Plaintiffs' Complaint do they explain how a photo or video on a user's personal device creates a "biometric facial scan." Nor do they explain how this "biometric facial scan" ever leaves the user's device, or how e.l.f. could ever gain access to this information. Plaintiffs cannot state a claim by starting with the hypothesis they must have to state a claim, and supporting it by jumping from one illogical conclusion to the next, without asserting any set of facts to support those conclusions. This case should be dismissed on that basis. *Twombly*, 550 U.S. at 570 (2007) (plaintiffs must allege "enough facts to state a claim for relief that is plausible on its face").

### C. Dismissal under Rule 12(b)(6) should be with prejudice.

Plaintiffs' request for leave to amend their Complaint, made in a fleeting footnote in their Response, is improper and waived. A court is not required to grant leave to amend when the request for such leave is improper. *See James Cape & Sons Co. v. PCC Const. Co*., 453 F.3d 396, 401 (7th Cir. 2006) (rejecting plaintiff's argument that the district court was required to grant it leave to amend because plaintiff's request—referenced once in a penultimate paragraph of its response to defendants' motion to dismiss—was improper). The only reference Plaintiffs make to amending their Complaint is in a footnote. Opp. at n. 13. This request is as improper in substance as it is in form. Plaintiffs do not explain how they will cure the deficiencies in their Complaint if given leave to amend. Because Plaintiffs cannot and have not shown how they can cure the defects in their pleading, their Complaint should be dismissed with prejudice. *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 335 (7th Cir. 2018) ("Nothing in Rule 15, nor in any of our cases,

suggests that a district court must give leave to amend a complaint where a party does not suggest to the court the ways in which it might cure the defects.").

### III. Plaintiffs do not meet the pleading requirements for heightened damages.

Consistent with the above, Plaintiffs' claims for heightened damages should be dismissed. Conclusory statements alleging that e.l.f. violated BIPA's requirements are not enough to state a claim for heightened damages under BIPA. *See, e.g., Kukovec*, at *8 (dismissing claims for heightened damages because "no . . . facts in the complaint point to recklessness or intent – *e.g.*, knowledge of BIPA's requirements or statements about purposefully not complying with the law); *Namuwonge v. Kronos, Inc.*, 2019 WL 6253807, at *5 (N.D. Ill. Nov. 22, 2019) (dismissing BIPA claims for reckless or intentional conduct because plaintiff's "abstract statements regarding damages [were] insufficient"). Not a single allegation in Plaintiffs' Complaint suggests that e.l.f. acted with an intentional or reckless state of mind.

<u>CONCLUSION</u>

All of the claims asserted in Plaintiffs' Complaint belong in arbitration. Plaintiffs were aware of the arbitration requirement or, at the very least, had reasonable notice of such a requirement, when they repeatedly accessed e.l.f.'s website, where the Terms of Use were conspicuously displayed – consistent with near universal webpage architecture - in the footer of every page of e.l.f.'s website. In the alternative, Plaintiffs' Complaint should be dismissed with prejudice because Plaintiffs do not plausibly allege that e.l.f. collected or possessed biometric identifiers, nor could they if given leave to amend (which they did not sufficiently request).

Dated: February 10, 2023     Respectfully submitted,

E.L.F. COSMETICS, INC.

By: _/s/ Matthew C. Wolfe_____
    One of Its Attorneys

Matthew C. Wolfe
Erin Bolan Hines
Yara K. Rashad
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel:  (312) 704-7700
mwolfe@shb.com
ehines@shb.com
yrashad@shb.com

***Attorneys for Defendant e.l.f. Cosmetics, Inc.***

## CERTIFICATE OF SERVICE

I, Matthew C. Wolfe, an attorney, hereby certify that on February 10, 2023, I caused a true and correct copy of **DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT IN FAVOR OF ARBITRATION, OR IN THE ALTERNATIVE, FOR FAILURE TO STATE A CLAIM** to be served on all counsel of record via ECF pursuant to the General Order on Electronic Filing of the United States District Court, Northern District of Illinois.

_/s/ Matthew C. Wolfe_