IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Ariel Davis, Lacie Davis, and Taylor Davis, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 22 C 5069 |
| v. | Hon. LaShonda A. Hunt |
| e.l.f. Cosmetics, Inc., | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Ariel Davis, Lacie Davis, and Taylor Davis bring this putative class action complaint against Defendant e.l.f. Cosmetics, Inc. for violating the Illinois Biometric Information Privacy Act of 2008, 740 ILCS 14/15 *et seq.* ("BIPA"). Defendant filed a motion to dismiss Plaintiffs' complaint in favor of arbitration, or alternatively, for failure to state a claim for which relief can be granted. For the reasons stated below, Defendant's motion [24] is granted in part and denied in part.

## BACKGROUND

Defendant manufactures and markets "quality, cruelty-free skin care and makeup products." (Compl. ¶ 39, Dkt. 1). On its website, Defendant allows users to see how its products might look on them through its "Virtual Try-On" feature. (*Id.* ¶ 57). When a user clicks on the "Virtual Try-On" link on Defendant's website, the following pop-up appears:

1



(*Id.* ¶ 61).

While there seems to be some uncertainty about when the pop-up began to appear on Defendant's website, Defendant ostensibly admits that this did not occur until May 25, 2022. (*See* Mot., Ex. A (Decl. of Shana Rungsarangnont) ¶ 10, Dkt. 24-1) ("Since May 25, 2022, the Terms of Use have been hyperlinked and presented through a pop-up window that appears and must be accepted via a 'required acceptance' before the user may use the Virtual Try-On tool").

Other than the pop-up, the only way users of Defendant's website can find the Terms of Use or the Privacy Notice is by scrolling to the footer of the website, where the two relevant policies are hyperlinked. Plaintiffs' Complaint includes the following image of the webpage:

(Compl. ¶ 73).

The first page of the Terms of Use states:

> PLEASE NOTE THESE TERMS OF USE CONTAIN A CLASS ACTION WAIVER AND AN ARBITRATION PROVISION SET FORTH BELOW, WHICH REQUIRE YOU TO ARBITRATE ANY CLAIMS YOU MAY HAVE AGAINST E.L.F. COSMETICS, INC. AND ITS AFFILIATES ON AN INDIVIDUAL BASIS. ARBITRATION ON AN INDIVIDUAL BASIS MEANS THAT YOU WILL NOT HAVE, AND YOU WAIVE, THE RIGHT FOR A JUDGE OR JURY TO DECIDE YOUR CLAIMS, AND THAT YOU MAY NOT PROCEED IN A CLASS, CONSOLIDATED, OR REPRESENTATIVE CAPACITY. YOU HAVE THE RIGHT TO OPT-OUT OF ARBITRATION AS EXPLAINED BELOW.

(Rungsarangnont Decl. ¶ 15 & Ex. 1 (Website Terms of Use effective as of June 13, 2022)).

The Terms of Use further elaborate on the scope of the arbitration agreement:

> Mindful of the high cost of legal disputes, not only in dollars but in time and energy, both you and e.l.f. Cosmetics agree that any and all disputes, actions, claims, or other controversies concerning or arising in any way out of your use (or lack of use) of, access (or lack of access) to, or a purchase from, the Website, the App, or any desktop or mobile application; the e.l.f. Virtual Makeup Try-On Tool; these Terms of Use; any product or service; and any advertising, promotion, or other communications between you and e.l.f. Cosmetics (collectively, a "Dispute"), whether based in contract, warranty, tort, statute, regulation, ordinance, or any other legal or equitable basis, shall be resolved exclusively through final and binding individual arbitration. "Dispute" will be given the broadest possible meaning allowable under law.
>
> This agreement to arbitrate covers and includes threshold questions of arbitrability. The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any and all disputes arising out of or relating to the formation, existence, scope, validity, interpretation, applicability, or enforceability of this agreement to arbitrate, or any part of it, or of these Terms of Use, including, but not limited to, any claim that all or any part of this agreement to arbitrate or the Terms of Use is void or voidable. If any party disagrees about whether the foregoing provision (or any portion of this agreement to arbitrate, including without limitation the provisions relating to arbitration) can be enforced or whether it applies to the dispute, the parties agree that the arbitrator will decide that dispute. Notwithstanding the foregoing, however, the parties agree that any issue concerning the validity of the class action

> waiver below must be decided by a court, and an arbitrator does not have authority to consider the validity of the class action waiver. Both you and e.l.f. Cosmetics understand and agree that we are waiving our right to sue or go to court to assert or defend our rights, except as set forth below.

(June 13, 2022 Terms of Use § XVI).

Plaintiffs allege that the Privacy Notice referenced in the pop-up does not mention anything related to the capture, use, collection, storage or biometric information or identifiers. (Compl. ¶ 64). However, the Terms of Use do, noting:

> The e.l.f. Virtual Makeup Try-On Tool uses a photo or live camera feed to show a simulation of how a product may look on the user in the image. e.l.f. Cosmetics does not collect, keep, or disclose the photo, image, and/or video feed, or any data associated with them. e.l.f. Cosmetics does not collect, keep, or disclose any biometric information or biometric data in connection with the e.l.f. Virtual Makeup Try-On Tool.

(*Id.* ¶ 65).

Plaintiffs say this statement is, at best, a half-truth because "[t]he passage does not inform website visitors that the Virtual Try-On" simulates how a product may appear on the user's face by "scanning their faces . . . and then using the biometric facial scan to place the product in the proper spot on the website visitor's face." (*Id.* ¶ 66). Defendant's Virtual Try-On feature "employs advanced facial detection technology, as demonstrated by the feature's ability to focus and to move the image's positioning in real time along with each face it detects." (*Id.* ¶ 71).

Named Plaintiffs are citizens and residents of Illinois who used the Virtual Try-On feature on Defendant's website at various times between September 2021 and January 2022. (*Id.* ¶¶ 20, 26, 32). All three allege the same facts: (1) they do not recall reviewing the Terms of Use and were not informed that Defendant would be collecting their biometric information identifiers; (2) they did not understand that Defendant would collect or distribute their biometric data and would not have used the Virtual Try-On feature had they been aware of that fact; (3) Defendant never

4

obtained Plaintiffs' informed, written consent to collect, transmit, store, or process their biometric information, or inform them whether their biometric information would be stored, destroyed, or transferred to a third party for processing; (4) Plaintiffs did not provide a written release authorizing Defendants to collect, store, or use their facial scans or facial geometry, and were never informed about the purpose of collecting their biometric data; and (5) Plaintiffs do not recall seeing the Terms of Use or the Privacy Notice when using the Virtual Try-On tool, nor do they recall Defendant making those policies readily accessible so that they could review them. (*Id.* ¶¶ 20-37).

Plaintiffs filed the instant complaint on behalf of themselves and a proposed class of similar individuals, asserting violations of Section 15(b) (Count I), Section 15(a) (Count II), and Section 15(c) (Count III) of BIPA. Defendant moved for dismissal, arguing that these claims must be resolved through arbitration, or, in the alternative, that Plaintiffs have failed to plausibly alleged violations of BIPA. The motion is fully briefed and ripe for resolution.

## **LEGAL STANDARDS**

Defendant brings its motion to compel arbitration under Federal Rule of Civil Procedure 12(b)(3), which allows the Court to dismiss an action for improper venue. When ruling on a Rule 12(b)(3) motion, "the district court is not 'obligated to limit its consideration to the pleadings [or to] convert the motion to one for summary judgment' if the parties submit evidence outside the pleadings." *Faulkenberg v. CB Tax Franchise Sys. LP*, 637 F.3d 801, 809-10 (7th Cir. 2011) (quoting *Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 733 (7th Cir. 2005)). "The party opposing arbitration bears the burden of identifying a triable issue of fact about the existence of the arbitration agreement" and "cannot avoid compelled arbitration by generally denying facts about an arbitration agreement but must instead 'identify specific evidence in the record demonstrating a material factual dispute for trial.'" *Kukovec v. Estée Lauder Cos., Inc.*, Case No.

5

22 C 1988, 2022 WL 16744196, at *2 (N.D. Ill. Nov. 7, 2022) (quoting *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002)).

Defendant alternatively moves to dismiss Plaintiffs' complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). While a complaint need not include "detailed factual allegations," a plaintiff must provide more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In analyzing a Rule 12(b)(6) motion, the Court must "accept all well-pleaded facts as true and draw all reasonable inferences in the plaintiff's favor." *White v. United Airlines, Inc.*, 987 F.3d 616, 620 (7th Cir. 2021). However, the Court need not accept legal conclusions as true. *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A claim must be facially plausible to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plausible claim is one that allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility requires more than a "sheer possibility," but does not rise to the level of probability. *Id.*

## DISCUSSION

### I. Rule 12(b)(3) – Arbitrability

Defendant contends that Plaintiffs' claims should be dismissed because they are subject to the arbitration clause in the Terms of Use found on its website. To enforce an arbitration agreement, courts must find: (1) there is an agreement to arbitrate; (2) the dispute at issue is within the scope of that agreement; and (3) a party refuses to arbitrate. *Druco Rests., Inc. v. Steak N Shake Enters., Inc.*, 765 F.3d 776, 781 (7th Cir. 2014). "Under the Federal Arbitration Act, an arbitration agreement must be enforced if the agreement is valid and the claims in the lawsuit are within its scope." *Kukovec*, 2022 WL 16744196, at *4 (citing 9 U.S.C. § 4). State contract law governs

decisions on the validity and scope of arbitration agreements. *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710-11 (7th Cir. 2019). The *Kukovec* court framed the issue presented in a case arising under similar facts as follows:

> "Formation of a contract requires mutual assent," and Illinois courts analyze assent using an objective standard. In the online context, the formation analysis comprises two questions: "whether the web pages presented to the consumer adequately communicate[d] all the terms and conditions of the agreement, and whether the circumstances support[ed] the assumption that the purchaser receive[d] reasonable notice of those terms," either via actual knowledge or constructive knowledge. Neither party claims plaintiff had actual knowledge of the agreement, so only constructive knowledge is at issue.
>
> The constructive-knowledge inquiry hinges in part on whether the terms and conditions were presented in clickwrap or browsewrap form. Clickwrap agreements require a customer to affirmatively indicate assent by clicking or checking a box. In browsewrap agreements, though, simply continuing to use the website is taken as assent, albeit passive, to the site's terms and conditions. Courts generally find assent in cases with clickwrap agreements but conduct a more detailed inquiry with browsewrap agreements.
>
> \*\*\*
>
> This is a "fact-intensive inquiry," that "depends on the design and content" of the website and, specifically, the "conspicuousness and placement" of the terms-and-conditions link. To determine whether terms and conditions are displayed conspicuously, courts look at a number of factors, including: whether the hyperlink's font is adequately contrasted by the color of its background; how cluttered the webpage is (i.e., whether other things obscure the relevant link); and whether a page's entire screen is visible at once, so that users don't have to scroll to find terms and conditions.

2022 WL 16744196, at \*4-5 (internal citations omitted).

Like the case at bar, the plaintiff in *Kukovec* used the virtual try-on feature on a cosmetic company's website. *Id.* at \*2. When she clicked on the "TRY IT NOW" button, a pop up appeared with a link to the defendant's privacy policy, which in turn contained a link to defendant's terms and conditions where an arbitration agreement could be found. *Id.* at \*5. The terms and conditions

7

were also available in the footer of defendant's website, where it was listed under the heading "Privacy & Terms" that was in all caps and a contrasting color; however, it was nestled among many other links and required the users to scroll to the bottom of the page to find it. *Id.* at *5-6. The *Kukovec* court found that because defendant had not shown that plaintiff had used any of the clickwrap pages on the website, it would consider only whether the terms and conditions on the bottom of the website provided constructive notice as browsewrap. *Id.* at *5. The court ultimately held that it did not, reasoning that "a website design that requires users to scroll all the way to the bottom to even become aware of the site's terms and conditions, then requires them to click on a buried link to learn the content of those terms and conditions, does not put a user on constructive notice" because "[a] user could easily try the tool without once confronting the terms-and-conditions link." *Id.* at *6.

Here, Plaintiffs allege they had no actual knowledge of the arbitration agreement; therefore, the Court must determine whether they had constructive knowledge. The clickwrap framework does not apply, as there is no evidence that the pop-up window on Defendant's website was operational prior to May 22, 2022—several months *after* Plaintiffs last accessed the Virtual Try-On feature.[1] As such, the only accessible link where Plaintiffs could retrieve Defendant's Terms of Use was at the bottom of the webpage.

Similar to the website in *Kukovec*, the link to Defendant's Terms of Use is in contrasting colors, but it is not in all caps or bold, making it even less conspicuous than the link in *Kukovec*. It is also contained among several other links at the bottom of the page. Indeed, the footer contains six other links, and just above it are 18 additional links under the headings "HELP," "DISCOVER

---

[1] The Court does not reach the issue of whether later users of the website who were confronted with the clickwrap pop-up had constructive notice of the arbitration agreement or how any ruling on that issue may affect the size or nature of the proposed class here.

E.L.F.," and "SERVICES." Finally, Plaintiffs allege the only way for consumers to even access the link "would be by scrolling to the very bottom of any elfcosmetics.com website and clicking one of several small links located there." (Compl. ¶ 73). Between the small font, the multiple links, and the requirement to scroll to the bottom of the page, the Court does not believe that Defendant's browsewrap arbitration agreement was sufficiently conspicuous to constitute constructive notice of the agreement to arbitrate. As in *Kukovec*, Plaintiffs here could easily access and use the Virtual Try-On tool without ever being aware of the Terms of Use. Therefore, Plaintiffs did not have constructive notice of the arbitration agreement, and Defendant's motion to dismiss and compel arbitration is denied.

**II.     Rule 12(b)(6) – Failure to State a Claim under BIPA**

    **A.     Section 15(b) – Count I**

Section 15(b) of BIPA states that "[n]o private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information," unless it informs the user in writing that biometric data is being collected or stored and the specific purpose and length of time for which the biometric data is being collected, stored, and used, and the user executes a written release. 740 ILCS 14/15(b). "Face geometry" is included within the definition of "biometric identifier." 740 ILCS 14/10.

Plaintiffs allege that Defendant "collects detailed and sensitive biometric identifiers and information, including complete facial scans, from its users through the Virtual Try-On tool, and it does this without obtaining their consent, or informing them that this data is being collected." (Compl. ¶ 11). Plaintiffs later reiterate that Defendant is "collecting, capturing, possessing, or otherwise obtaining biometric information and identifiers from its online visitors." (*Id.* ¶ 57). Plaintiffs go on to explain that the Virtual Try-On tool works by "scanning [users'] faces, whether

9

live or from the photo, and then using the biometric facial scan to place the product in the proper spot on the website visitor's face." (*Id.* ¶ 66). In other words, the Virtual Try-On feature "employs advanced facial detection technology, as demonstrated by the feature's ability to focus and to move the image's positioning in real time along with each fact that it detects." (*Id.* ¶ 71). As a result, "[h]aving gained access to the user's photo or live video feed, [Defendant] collects, captures, possesses or otherwise obtains users' facial biometric information and identifiers as part of the Virtual Try-On process." (*Id.* ¶ 70). These allegations that Defendant's Virtual Try-On tool works by capturing, possessing, or otherwise obtaining (however temporarily) Plaintiff's facial geometry (which is a defined biometric identifier) to overlay its products on the photo or video feed are sufficient to state a plausible violation of Section 15(b).

Other cases considering Section 15(b) claims involving a virtual try-on feature have found similar allegations adequate to survive a motion to dismiss. *See, e.g., Kukovec*, 2022 WL 16744196, at *6 (denying dismissal based on allegations that the virtual try-on tool uses facial-geometry scans from a user's uploaded picture or live camera and identifies "the shape and features of the user's face in order to accurately overlay the virtual makeup product onto the image provided."). The *Kukovec* court held that plaintiff's Section 15(b) claims should move forward, reasoning "[w]ith that description of the technology, it is reasonable to infer that collection of biometric data is necessary for it to work." *Id*. In *Theriot v. Louis Vuitton N. Am., Inc*., the court reached a similar conclusion, explaining:

> Here, plaintiffs allege that [defendant] violated § 15(b) through its Virtual Try-On tool. The plaintiffs assert that [defendant] encourages its website visitors to use the Virtual Try-On tool, through which it collects their facial geometry. The plaintiffs' allegations are sufficient to survive a motion to dismiss.

645 F. Supp. 3d 178, 183-84 (S.D.N.Y. 2022). Finally, in *Powell v. Shisheido Ams. Corp*., Case No. 21 C 2295, 2022 WL 19914948, at *5-6 (C.D. Ill. Aug. 22, 2022), the court found plaintiff's

10

allegations that the virtual try-on tool on defendant's website created a facial geometry map to show how makeup would look on the user's face, "amount[ed] to a plausible allegation that Defendant actively captured and/or collected biometric identifiers." The allegations in this case are virtually identical to those cases. Because the logic of those courts is persuasive, the Court rejects Defendant's arguments that Plaintiffs have failed to meet the notice pleading requirements of Rule 8 or that the section 15(b) claim is insufficiently pled.

Defendant also asserts that Plaintiffs' claims should be dismissed because they failed to allege that the biometric identifier (*i.e.*, facial geometry) was used to identify any particular individual. (Mot. at 17, Dkt. 24). But there is no requirement anywhere in the statutory language that Plaintiffs demonstrate the face geometry scans were actually used to identify them. *See Daichendt*, 2022 WL 17404488, at *5 ("The court disagrees with defendant that plaintiffs must specifically allege that defendant, in fact, 'used' their biometric data to determine their identities"). The nature of a "biometric identifier" is that it is capable of determining an individual's identity. *See* 740 ILCS 14/5(c) ("Biometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual.") The statute plainly says that a private entity cannot collect, capture, purchase, receive through trade, or otherwise obtain a person's biometric identifier without appropriately informing them and securing a release. Thus, the only relevant question is whether Plaintiffs adequately pled that Defendant collected, captured, or otherwise obtained Plaintiffs' face geometry through the Virtual Try-On feature.

The Court has already determined that Plaintiffs met this standard. As in *Kukovec*, "[a]t this stage, it's enough that plaintiff alleged the use of the try-on tool on defendant's website, and

11

that defendant possessed and collected biometric data through use of the tool." 2022 WL 16744196 at *7. Therefore, the section 15(b) claim in Count I may proceed.[2]

B.  **Section 15(a) – Count II**

Section 15(a) of BIPA states that "[a] private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first" and "a private entity in possession of biometric identifiers or biometric information must comply with its established retention schedule and destruction guidelines." 740 ILCS 14/15(a). Essentially, there are two potential violations under Section 15(a): (1) a failure to develop and publish a written policy to establish retention and destruction guidelines of biometric data; and (2) a failure to comply with an established retention and destruction policy.

Although neither party directly raised standing in briefing the instant motion, "the court raises this issue *sua sponte*, as it must." *Daichendt v. CVS Pharmacy, Inc.*, Case. No 22 C 3318, 2022 WL 17404488, at *3 (N.D. Ill. Dec. 2, 2022) (dismissing BIPA Section 15(a) claim because plaintiff alleged only that defendant failed to create a retention policy). For a federal court to have subject matter jurisdiction over a claim, the plaintiff must have Article III standing, which requires

---

[2] The Court recognizes that *Daichendt* dismissed the plaintiffs' Section 15(b) claims because they failed to allege that "defendant's collection of their biometric data made defendant *capable of* determining their identities." 2022 WL 17404488, at *5 (emphasis in original). And some courts in this district have followed that holding. *See Clarke v. Aveda Corp.*, Case No. 21-cv-4185, 2023 WL 9119927 at *2 (N.D. Ill. Dec. 1, 2023) (agreeing that the collection of data using a virtual hair color tool "does not constitute biometric identifier or biometric information without allegations that [defendant] was capable of identifying individuals who used" that tool); *Castelaz v. Estee Lauder Cos.*, Case No. 22 C 5713, 2024 WL 136872 at *6-7 (N.D. Ill. Jan. 10, 2024) (citing both *Daichendt* and *Clarke* in concluding that the ability to ascertain identities is "the most foundational aspect of a BIPA claim"). Nevertheless, as already explained, the Court does not find support in the statute for this "narrower reading of BIPA's broad language." *Konow v. Brink's Inc.*, Case No. 23 C 760, 2024 WL 942553 at *4 (N.D. Ill. Mar. 5, 2024) ("This court is not certain that the 'uniquely identifying' test is supported by BIPA's plain language.").

12

the following three elements to be satisfied: (1) plaintiff must have suffered an actual or imminent, concrete and particularized injury-in-fact; (2) there must be a causal connection between the injury and the conduct complained of; and (3) there must be a likelihood that this injury will be redressed by a favorable decision. *Bryant v. Compass Group USA, Inc.*, 958 F.3d 617, 620-21 (7th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

In *Bryant*, plaintiff's claim was based on the defendant's failure to develop and publish a biometric information policy, and "not under the provision requiring compliance with the established retention schedule and destruction guidelines." 958 F.3d at 626. The Seventh Circuit narrowly held that such claims fail to allege the particularized harm necessary to establish Article III standing because "the duty to disclose under section 15(a) is owed to the public generally, not to particular persons whose biometric information the entity collects." *Id*. A few months later, in *Fox v. Dakkota Integrated Sys., LLC*, the Seventh Circuit clarified that plaintiff's section 15(a) claim there met the requirements for Article III standing because she accused defendant "of violating the full range of its section 15(a) duties by failing to develop, publicly disclose, *and comply with* a data-retention schedule and guidelines for the permanent destruction of biometric data when the initial purpose for collection ends." 980 F.3d 1146, 1154 (7th Cir. 2020) (emphasis in original).

After reviewing Plaintiffs' complaint in its entirety, the Court concludes that their section 15(a) claim is closer to *Bryant* than *Fox.* As an initial matter, Plaintiffs denominated their second cause of action: "Failure to Develop and Make Publicly Available a Written Policy for Retention and Destruction of Biometric Identifiers." (Compl. at 23). And in the general allegations, which Count II incorporates, they state that Defendant "does not have a publicly available written policy establishing a retention schedule and guidelines for permanently destroying biometric identifiers

13

or biometric information obtained from its website users" and Defendant "has not destroyed consumers' biometric data within the timeframes established by BIPA." (*Id.* ¶¶ 74-75). Those allegations seem to put the claim squarely within *Bryant*. On the other hand, Plaintiffs allege in Count II that Defendant "did not develop, possess, comply with or publish to its website users . . . such a written policy at any time," (*Id.* ¶ 100), which comports with the language the Seventh Circuit deemed appropriate to establish standing in *Fox.*

Whether Plaintiffs are litigating about Defendant's failure to develop and publish a biometric data policy (a *Bryant* claim), or Defendant's failure to comply with their own policy (a *Fox* claim), appears to be definitively answered at the end of Count II, where Plaintiffs seek an injunction "requiring [Defendant] to develop a written policy, and inform Plaintiffs and the other Class members of that policy, after ensuring that their information is destroyed." (*Id.* at ¶ 103). Notwithstanding the inclusion of the *Fox* "comply with" language in a handful of paragraphs in the complaint, the heart of Plaintiffs' section 15(a) claim is that Defendant did not develop and publish policies and guidelines for their collection, retention, and destruction of biometric data via the virtual try-on tool, which is not sufficient to confer Article III standing. *See Daichendt*, 2022 WL 17404488, at *3; *Halim v. Charlotte Tilbury Beauty, Inc.*, No. 23-cv-0094, 2023 WL 3388898, at *8-9 (N.D. Ill. May 11, 2023).

Plaintiffs do allege that Defendant failed to "comply with BIPA's retention and destruction" requirements. (Compl. ¶¶ 13, 15, 101). Nevertheless, "[a]s the Seventh Circuit has clarified, failure to 'create' a policy under § 15(a) violates § 15(a), but it is failure to comply *with this policy*, not failure to comply *with § 15(a)*, that establishes standing in federal court." *Daichendt*, 2022 WL 1704488, at *3 (emphasis in original). Even the allegation of injury arising from "the unknowing loss of control of their most unique biometric identifiers, and violations of

their privacy due to [Defendant's] collection, capture, and storage of their biometric information and biometric identifiers, and its potential sharing of the data with foreign companies[,]" (Compl. ¶ 102), fall short, as "any such harm is relevant to § 15(b)'s informed consent regime, not § 15(a)'s retention policy regime." *Theriot*, 2022 WL 17417261 at *3 (citing *Bryant*, 958 F.3d at 620, 626-27).

Because Plaintiffs do not allege facts to plausibly support a claim under section 15(a) against Defendant for failure to comply with Defendant's biometric data policy, and instead allege only a generalized failure to develop and publish such a policy, they lack standing to proceed. Therefore, the section 15(a) claim in Count II is dismissed without prejudice.[3]

### C. Section 15(c) – Count III

Section 15(c) of BIPA states that "[n]o private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from" a customer's biometric data. The Seventh Circuit addressed standing in section 15(c) claims in *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241 (7th Cir. 2021). The *Thornley* holding was succinctly explained in *Halim* as follows:

> The appellate court explained that section 15(c) creates a "general rule that prohibits the operation of a market in biometric identifiers and information." Without any "allegations of concrete and particularized harm to the plaintiffs," a claim that defendant violated section 15(c) is insufficient to establish Article III standing. It noted that a plaintiff might have a section 15(c) claim if, for example, the plaintiff asserted "that by selling her data, the collector has deprived her of the opportunity to profit from her biometric information"; "that the act of selling her data amplified the invasion of her privacy that occurred when the data was first collected, by disseminating it to some unspecified number of other people"; or "that the scraping

---

[3] Because Count II is dismissed without prejudice, Plaintiffs are not precluded from seeking leave to file an amended complaint that more clearly articulates a particularized injury under section 15(a), or from pursuing this claim in Illinois state court where Article III standing is not an issue.

15

>of data from social media sites raises the cost of using those sites in
>some respect."

*Halim*, 2023 WL 3388898, at *9 (internal citations omitted).

In *Halim*, the plaintiff brought claims based on a cosmetics website's virtual try-on tool; the court found that it lacked subject matter jurisdiction over the section 15(c) claim because the allegations focused "on how Defendants 'commercially benefitted' from the dissemination of the data 'because this commercial dissemination assists Defendants with business development, data analytics and consumer advertising'" but did not allege the type of injury enumerated in *Thornley*. *Id.* at *10. Other district courts in Illinois have reached similar conclusions where plaintiffs simply allege that defendants used biometric data to improve their products. *See, e.g., Daichendt*, 2022 WL 17404488, at *3-4; *Hazlitt v. Apple, Inc.*, 543 F. Supp. 3d 643, 651-52 (S.D. Ill. 2021).

In the instant case, Plaintiffs' complaint suffers from the same problem. Plaintiffs merely allege that Defendant profited from the capture of the biometric data because the virtual try-on tool improved users' experience on the website, which lead to increased sales volume. (Compl. ¶¶ 110-13). This is the type of claim that *Halim* and other courts have repeatedly rejected as failing to establish particularized injury.

The Court follows the reasoning in *Halim* and concludes that Article III standing has not been established here either. Therefore, the section 15(c) claim in Count III is dismissed.[4]

---

[4] Even if the Court were to find that Plaintiffs had standing to bring this claim, Count III would be dismissed for failure to state a claim under Rule 12(b)(6). As Defendant points out in its brief, Section 15(c) prohibits sales of biometric data. (Mot. at 21). Although the provision includes the catchall phrase "otherwise profit," the Court believes that term "should be interpreted in light of the terms that precede it: sell, lease and trade," and that the term "otherwise profit" is meant to apply to commercial transactions where "the access to biometric data is shared or given to another." *Vance v. Amazon.com, Inc.*, 534 F. Supp. 3d 1314, 1322-24 (W.D. Wash. 2021). Here, the complaint does not allege that Defendant ever used Plaintiffs' biometric data in a commercial transaction with a third party. Thus, the Section 15(c) claim would also fail for that reason.

D.     **Heightened Damages**

Finally, Defendant argues that the allegations of recklessness are insufficient. The liquidated damages available under BIPA vary depending on a defendant's mental state. A court may award up to $5,000 for each *intentional or reckless violation* but only up to $1,000 for each negligent violation. 740 ILCS 14/20. In *Kukovec*, the court dismissed the claims for heightened damages, where no "facts in the complaint point to recklessness or intent—*e.g.*, knowledge of BIPA's requirements or statements about purposefully not complying with the law." 2022 WL 16744196, at *8. Defendant cites another case reaching the same conclusion. *Namuwonge v. Kronos*, Inc., 418 F. Supp. 3d 279, 286 (N.D. Ill. Nov. 22, 2019).

But the majority of recent cases that directly addressed this issue held that a plaintiff is not required to make specific allegations about a Defendant's mental state to successfully plead a BIPA claim. *See generally Kyles v. Hoosier Papa LLC*, No. 20 C 7146, 2023 WL 2711608, at *7 (N.D. Ill. Mar. 30, 2023); *Sosa v. Onfido, Inc.*, 600 F. Supp. 3d 859, 875 (N.D. Ill. 2022); *Ibarra v. Prospera, LLC,* No. 20 C 7015, 2021 WL 1921015, at *4 (N.D. Ill. May 12, 2021)*; Brandenburg v. Meridian Senior Living,* LLC, 564 F. Supp. 3d 627, 634 (C.D. Ill. 2021); *Cothron v. White Castle Sys., Inc.,* 467 F. Supp. 3d 604, 615 (N.D. Ill. 2020); *Snider v. Heartland Beef, Inc.,* 479 F. Supp. 3d 762, 770 (C.D. Ill. 2020). These cases reason that BIPA's text makes mental state part of the remedy, which is governed at the pleadings stage by Rule 8(a)(3), not part of the claim governed by Rules 8(a)(2) and 12(b)(6). Rule 8(a)(3) merely requires that a pleading contain a "demand for the relief sought[.]" It does not require "a short and plain statement of the claim showing that the pleader is entitled to relief" like Rule 8(a)(2) or statement of "a claim upon which relief can be granted" like Rule 12(b)(6). *See, e.g., Sosa.*, 600 F. Supp. 3d at 875. Thus, because mental states are relevant only for purposes of remedies under 740 ILCS 14/20, a plaintiff "need not plead facts

17

(such as facts plausibly suggesting negligence, recklessness, or intentional conduct) that show . . . entitlement to these precise forms of relief." *Id.* at 874.

The Court agrees with the majority rationale. Rules 8 and 12 do not require Plaintiffs to plead specific facts regarding Defendant's mental state to show entitlement to the forms of relief available under BIPA. Accordingly, the request for heightened damages will not be dismissed at this juncture of the case.

## **CONCLUSION**

For all the foregoing reasons, Defendant's Motion to Dismiss Plaintiffs' Complaint in Favor of Arbitration, or in the alternative, for Failure to State a Claim [24] is granted in part and denied in part. The Court denies Defendant's request to dismiss for improper venue and to compel arbitration. Count I may proceed along with Plaintiffs' request for heightened damages. Counts II and III are dismissed for lack of standing.

**DATED:** May 28, 2024                    **ENTERED:**

                                            _____
                                            LASHONDA A. HUNT
                                            United States District Judge